UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

COLUMBIA SPORTSWEAR
COMPANY, an Oregon corporation,

Civ. No.: 03:17-CV-0342-AC

Plaintiff,

OPINION AND ORDER

v.

3MD, Inc., dba DENALI ADVANCED
INTEGRATION, a Washington corporation,

Defendant.

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Columbia Sportswear Company ("Columbia") filed suit in March 2017 against

Defendants 3MD, Inc., dba Denali Advanced Integration ("Denali"), and Michael Leeper ("Leeper"),

alleging Leeper, a former Columbia employee, repeatedly hacked into Columbia's private computer

network after he left Columbia for Denali's employ. Leeper has since settled with Columbia the

civil claims against him and pleaded guilty to criminal charges stemming from the same allegations. Columbia's claims against Denali, however, remain pending. To support its defense, Denali intended to disclose information from an internal interview it conducted with Leeper, but Leeper objected on ground of privilege. Currently before the court is Leeper's Motion for a Protective Order, ECF No. 47 ("Motion"), aiming to shield the interview from discovery. Because the court finds the interview is protected under the joint-defense privilege,[1] Leeper's Motion is granted.

*Background*

Leeper worked as a high-level employee in Columbia's Information Technology ("IT") Department, where he had access to the company's private network and email accounts. (Complaint (ECF No. 1) ¶ 2.) In February 2014, he resigned to accept an executive position with Denali, an IT consultancy. (*Id.* at ¶¶ 2, 6.) One day before he was to leave Columbia and, accordingly, have his network access terminated, Leeper allegedly created two false login accounts that maintained his access to Columbia's private network after he resigned. (*Id.* at ¶¶ 2, 21–25.) Columbia alleges, and Leeper has admitted in his criminal plea, that for the next two and a half years, Leeper used these logins to hack into company email accounts and other parts of Columbia's private network. (*Id.* at ¶¶ 3, 27–34.) Columbia reported the network intrusions to the FBI, and a federal criminal investigation ensued. (*Id.* at ¶ 35; Def. Denali's Response to Mot. to Compel (ECF No. 54) ("Resp.") at 4–5.)

On October 21, 2016, Columbia notified Denali of the potential claims facing the company.

---

[1] The court has reviewed *in camera* a transcript of the interview and relies on its contents to support the conclusions set forth below. However, because the interview is now held to be privileged, the substance of the interview will not be discussed herein, but rather described only generally. The transcript, attached as Exhibit 1 to the Declaration of Jennifer Sprague, is filed under seal with this Opinion and Order, and available for review on appeal, if an appeal is filed.

(Decl. of Samuel C. Kauffman ("Kauffman Decl.") ¶ 2; Decl. of Randy J. Aliment in Supp. of Denali's Mot. for Summ. J. (ECF No. 34) ("Aliment SJ Decl.") ¶ 3.) That same day, FBI agents visited Denali's headquarters, served a preservation notice, and apprised Denali's corporate secretary, Majdi Daher, of the allegations against Leeper. (Decl. of Majdi Daher ("Daher Decl.") ¶¶ 1–3.)

Daher sent Leeper a text message asking "What is going on? They are at [headquarters]," and Leeper called Daher later that afternoon. (*Id.* at ¶ 3.) As Daher puts it, Leeper "emphatically denied" the allegations, explaining "he had never hacked into Columbia's network and that there must be a mistake and a reasonable explanation" and offering that "Columbia's IT department was in disarray and this may be a possible reason" for the hacking, or that perhaps Leeper had been a victim of identity theft. (*Id.*)

On October 26, 2016, Leeper visited Denali's headquarters to meet with Daher. (*Id.* at ¶ 4.) According to Daher, Leeper continued to be "adamant that he never hacked into Columbia's network," denied even knowing the bases for these allegations, and again framed the claims as a misunderstanding. (*Id.*)

The following day, Denali placed Leeper on administrative leave. (Decl. of Jennifer Sprague in Support of Denali's Mot. for Summ. J. (ECF No. 36) ("Sprague SJ Decl.") Ex. 1.) On November 8, in response to a grand jury subpoena, Denali delivered documents, computers, and other information it possessed to the FBI. (Daher Decl. ¶ 5.)

Later on November 8, Daher contacted Leeper to inform him that Daher was about to meet with Assistant U.S. Attorney Scott Bradford and FBI Special Agent Stephen Roberts to share the status of Denali's investigation, including statements Leeper had made to Daher. (*Id.* at 6.) At the

meeting, Daher, Bradford, and Roberts discussed the FBI's grounds for the charges to be brought against Leeper. (*Id.*) According to Daher, Bradford and Roberts explained that, at the time, they believed Leeper had acted as a "rogue employee" and that the hacking techniques used appeared rather unsophisticated. (*Id.*) This struck Daher as odd and "caused [him] to question whether the hacker could be [] Leeper who is extremely gifted in the computer technology field." (*Id.*)

On November 18, 2016, Leeper's attorney, Samuel Kauffman, and Denali's attorneys, Randy Aliment and Ben Stone, held a phone conference. (Declaration of Randy Aliment ("Aliment Decl.") ¶ 2.) The parties disagree as to what occurred during that meeting.[2] According to Aliment, Kauffman continued to deny Leeper's involvement in the hacking, stating that FBI would find no such evidence on an "iMac mini that []Leeper used for work at Denali." (*Id.*)

Kauffman, however, denies "entertain[ing] or answer[ing] questions relating to [] Leeper's guilt or innocence" in that meeting. (Kauffman Decl. in Support of Leeper's Reply ("Kauffman Reply Decl.") at ¶ 4.) He states he "did agree to inquire of [] Leeper as to some specific dates and times that []Stone had forwarded," but the discussion, he says, "was limited to []Leeper's whereabouts on those specific dates and times and whether he could have physically accessed the specific IP address" alleged. (*Id.* at ¶ 5.) Kauffman carefully distinguishes what Denali alleges — that Leeper was convinced *there was no evidence* that he accessed the Columbia computer system on the iMac mini that Leeper used for work at Denali — from what he admits to stating — that "Leeper was convinced *there would be no Columbia data or files* on that machine." (*Id.* at ¶ 6) (emphasis added). Undisputed, however, is that Kauffman neglected to mention that, unbeknownst

---

[2] Denali requested leave to file a sur-reply to respond to certain factual disputes raised in Leeper's reply brief. The court denied that request and notes that the facts in contention, even if construed in Denali's favor, do not affect the outcome of this Motion.

to Denali and the FBI at the time, Leeper's primary Denali work computer was a "MacBook Air" that had *not* been produced to the FBI and was, at the time, in Kauffman's possession. (Aliment Decl. ¶ 2.)

Based on Kauffman's assertions (as Denali describes them), Leeper's maintained innocence, and because Denali's internal investigation, including interviews with several other Denali employees, yielded no evidence of hacking, Denali decided to allow Leeper to return to work.[3] But Denali also requested that Leeper agree to an interview with its human resources director, Jennifer Sprague. (Aliment Decl. ¶ 3; Declaration of Jennifer Sprague in Support of Denali's Opp. to Mot. for Protective Order ("Sprague Decl.") ¶¶ 1,3.) Kauffman stated that given the criminal charges pending against him, Leeper would agree to an interview only if Denali would enter into a joint-defense agreement. (Kauffman Decl. ¶ 5.) Denali agreed, and on November 21, 2016, the parties executed the Joint Litigation and Confidentiality Agreement ("JLCA"). (*Id.*; Ex. 1.)

The JLCA pertains to "any . . . factual and legal matters . . . relating to potential litigation with Columbia" concerning "alleged unlawful access to the computer network of Columbia," and provides, *inter alia*, that "all oral and written communications between" the parties will remain "confidential and protected from disclosure to any Third Party . . . ." (*Id.* at ¶¶ 1–2.) Either signatory to the JLCA could terminate participation in the agreement at any time, but the "confidences protected by th[e] agreement [] extend to any future litigation . . . ." (*Id.* at ¶ 5.)[4]

---

[3] Denali's accounts conflict slightly as to when exactly Leeper returned to work. It appears Denali "*decided* [] Leeper could return to work" before November 21, 2016, (Aliment Decl. ¶ 2) (emphasis added), but Sprague testifies Leeper did not return to work until November 28, 2016. (Sprague SJ Decl. ¶ 5.)

[4] The terms of the JLCA are discussed in detail in Part I.A of this Opinion and Order.

On November 22, 2016, Leeper, Daher, Kauffman, and Aliment met via video conference again to discuss the allegations. (Aliment Decl. ¶ 4; Kauffman Reply Decl. ¶ 7.) On December 9, 2016 Sprague interviewed Leeper (the "interview"), with Aliment and Kauffman in attendance. (Sprague Decl. ¶ 3.) The interview was later transcribed into a memorandum. (*Id.*; *see* Ex. 1.)

On March 1, 2017, Columbia filed civil suit asserting claims under the Computer Fraud and Abuse Act and the Federal Wiretap Act, and for common law conversion against both Leeper and Denali, alleging Denali is vicariously liable because Leeper committed the hacking at least in part for commercial benefit on Denali's behalf and that Denali knew of the information thereby gained. (Compl. ¶¶ 29, 39–58.)

On March 10, Daher and Aliment met again with Bradford and Roberts. (Daher Decl. ¶ 8.) According to Daher, the four discussed the status of Denali's own internal investigation, including information the company had gleaned from Leeper. (Resp. at 16.) Denali states the FBI was "unconvinced" by that account, however, and believed it had evidence sufficient to pursue the case against Leeper. (Resp. at 16.)

Four days later, Denali terminated Leeper's employment, citing violation of its Electronic Communications Policy, Code of Business Conduct and Ethics, and Information Security Policy, after the company discovered that Leeper's personal computer, acquired while he worked for Columbia, still contained information from his prior employment there. (Sprague SJ Decl. ¶ 6.)

During civil discovery in April 2017, Denali disclosed to Columbia it had "detailed notes from interviews with Denali personnel, including [] Leeper, that took place in an HR investigation." (Kauffman Decl. Ex.2.) Kauffman told Denali's counsel that such a disclosure would violate the terms of the JLCA. (*Id.* at ¶ 8.) Denali heeded Kauffman's concern, producing its investigation

report but redacting the portion containing notes from the Dec. 9 interview. (Kauffman Decl. Ex. 3.) Denali explained the redacted material was privileged "joint defense" material subject to "[a] joint-defense agreement. . . ." (*Id.*)

In August 2017, Leeper pleaded guilty to violations of 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(I)–(iii) and reached settlement with Columbia as to all of Columbia's civil claims against him. (*See* Plea Agreement Letter (ECF No. 7) to Case No.3:17-cr-00304-JO-1 ("Plea Agreement"); Kauffman Decl.Ex. 4; Stipulation of Dismissal (ECF No. 52); Dismissal Order (ECF No. 53).) Upon reading Leeper and Columbia's settlement agreement, Aliment informed Kauffman that the JLCA between Leeper and Denali was void and terminated. (Aliment Decl. ¶ 17–19.)

Columbia's claims against Denali remain. (Kauffman Decl. Ex. 4.) Denali has moved for summary judgment, and that motion is currently under advisement before this court. (ECF No. 33.) As discovery progressed, Denali informed Leeper it intended to allow its witnesses to testify about the contents of Leeper's communications to Denali during the Dec. 9 interview. (Def. Leeper's Motion for Protective Order, ECF No. 47 ("Motion"), at 5.) Leeper now moves for a protective order to prevent Denali from disclosing such information, asserting the communications he made during the interview are protected by joint-defense privilege.

*Discussion*

The Ninth Circuit has "long recognized" the joint-defense privilege as "an extension of the attorney-client privilege." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (citing *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000); *see also United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (recognizing joint-defense privilege as extension of attorney-client privilege, protecting "not only the confidentiality of communications passing from a party to his or

her attorney but also from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel"). The joint-defense privilege is premised upon the "unchanged" rationale that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *Gonzalez*, 669 F.3d at 978 (citing *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)). As is the case with its parent, the attorney-client privilege, the party asserting the joint-defense privilege bears the burden of establishing the existence of the relationship and the privileged nature of the communication. *Id.* (citing *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir.2010)). For purposes of the joint-defense privilege specifically, this translates to establishing that the parties' interests were sufficiently common so as to trigger a joint defense and that the communications protected were "intended to facilitate representation. . . ." *Id.* at 979–81 (holding that only communications made in course of ongoing common enterprise and intended to further that enterprise are protected); *accord. In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129–30 (9th Cir. 2012).

Leeper poses that the appropriate test for assessing whether the interview is protected joint-defense material is whether the exchange was made not to facilitate representation of both parties jointly but "'to facilitate representation' of *either* party." (Motion at 6) (emphasis added) (quoting *Santella v. Grizzly Indus., Inc.*, 286 F.R.D. 478, 483 (D. Or. 2012) and citing *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 580 (N.D. Cal. 2007)). But careful review of joint-defense jurisprudence shows that the insertion of "either" into the test is likely erroneous. True, the *Santella* court borrowed that language from *In re Pac. Pictures Corp.*, 679 F.3d at 1129–30. But the full discussion in *Pac. Pictures* arose from the Ninth Circuit's rejection of joint-defense privilege

because the communication in question there facilitated *neither* party's defense. 679 F.3d at 1129–30 ("Furthermore, the statements here were not 'intended to facilitate representation' of either [defendant] or the government.") To extract that the joint-defense privilege is triggered when a communication relates merely to *either* party's defense from *Pac. Pictures*'s negation would be illogical. And *Nidec* in fact confirms that joint-defense privilege requires both that there be a common interest and that "the communication at issue be designed to further *that* [legal] effort"—that is, the legal effort of *both* parties. 249 F.R.D. at 579 (alterations in original) (citation omitted). This more stringent requirement is consistent with the Ninth Circuit's reasoning that, because the joint-defense privilege is not a "separate privilege" but rather an extension of attorney-client privilege, it too should be construed narrowly. *In re Pac. Pictures Corp.*, 679 F.3d at 1128, 1129.

Therefore, under the appropriate test, Leeper must show both that his and Denali's legal interests were sufficiently common to trigger the privilege and that the interview was intended to further the parties' common interest.

### I.    Common Interest

The common interest with which the joint-defense privilege is concerned is, more precisely, a "common legal strategy." *Id.* at 1129 (citing *Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir.1965)); *see also Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) ("[T]he parties among whom [joint-defense] privileged matter is shared must have a common legal, as opposed to commercial, interest."). A "shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within" the privilege. *In re Pac. Pictures Corp.*, 679 F.3d at 1129. The Ninth Circuit also has acknowledged that parties

may have a common legal interest as to one substantive claim but, concurrently, their interests may be uncommon on another. *Gonzalez*, 669 F.3d at 981 ("Alternatively, it may also be that [the parties'] 'joint defense' strategy always related only to the use-of-fire charge and that they remained committed on this point notwithstanding other defense changes.")

Leeper argues that his and Denali's interests were sufficiently common to trigger joint-defense privilege even before the conception of the JLCA. He contends that once Denali received notice of Columbia's suit, which sought to hold Denali liable under a *respondeat superior* theory, Denali's dual legal interests became to argue (1) that it was not Leeper who hacked Columbia's system, and (2) even if it was, he did not do so for Denali's benefit. Therefore, Leeper reasons that from the inception of the lawsuit, he and Denali shared at least the first of those legal interests.

Denali acknowledges that the parties' interest was somewhat common but attempts to paint that interest as a mere shared desire in the same outcome, as *Pac. Pictures* deemed insufficient to trigger the joint-defense privilege. It also asserts that "the parties were pursuing antagonistic litigation strategies immediately following the FBI raid on October 21, 2016," because Denali's "litigation strategy was one of full cooperation with and disclosure to the FBI," while Leeper's was aimed at concealing his crimes by "dece[iving]" both Denali and the government. (Resp. at 19, 20.)

Leeper's characterization of the legal interests at play is more accurate. Under *Gonzalez*, it is enough that parties' legal interests be sufficiently common on one substantive claim or point, even if they diverge on another. So long as the communication in question relates to a joint-defense strategy related to that common claim, it suffices to trigger the joint-defense privilege. Once Denali learned of the impending suit, its primary legal interest became denying outright that Leeper committed the hacking at all. That interest mirrored and coextended with Leeper's, who himself

denied the allegations outright. Moreover, Denali's conduct in the weeks following its notice of the suit evidences that interest, most notably, allowing Leeper to return to work.

### A.   The JLCA

Even if legal posture and Denali's conduct alone were insufficient to invoke the joint-defense privilege, the existence and terms of the JLCA strongly support that the parties shared a common legal interest.

A "joint defense agreement ["JDA"] establishes an implied attorney-client relationship" between co-defendants and their respective attorneys. *Henke*, 222 F.3d at 637 (9th Cir. 2000). It does not contractually "create whatever rights the signatories chose, but [does constitute] written notice of defendants' invocation of privileges set forth in common law" and "establish[es] that defendants are collaborating . . . ." *United States v. Stepney*, 246 F. Supp. 2d 1069, 1079, 1079 n.5 (N.D. Cal. 2003).

Thus, a JDA is relevant to whether parties shared a common legal interest but "is not necessarily an all-or-nothing proposition." *Gonzalez*, 669 F.3d at 98; *accord. In re Pac. Pictures Corp.*, 679 F.3d at 1128–29 ("[T]he parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten."). The analysis endorsed by the Ninth Circuit also takes into account the context, "timeline of events and []facts" surrounding the creation and existence of a joint defense agreement. *Id.* For example, such an agreement could "exist[] at the outset between the parties and their counsel, but" end if one party decides "to pursue his own defense and blame [the other] for the crime (thus ending their common legal interests)." *Id.* (citing *In re Grand Jury Subpoena: Under Seal*, 415 F.3d at 341 (affirming district court's finding that disclosures made before common interest agreement were not privileged);

and *Gilson v. Sirmons*, No. CIV–01–1311–C, 2006 WL 2320682, *30 (W.D. Okla. 2006), (determining if a joint defense agreement existed prior to severance of the parties' cases and if information gained in confidence during those joint defense efforts remained protected)).

Leeper poses that the parties' entrance into the JLCA necessarily signaled that their interests were sufficiently aligned to warrant application of the joint-defense privilege. In so doing, he is careful — and wise — not to conflate the joint-defense privilege with simple contract law. Rather, he asserts that "the JLCA was intended to document the parties' understanding regarding the exchange of information deemed to be subject to the joint-defense privilege." (Motion at 10, n.2.) The JLCA merely documented "the expectations of the parties' already-existing joint-defense arrangement," he claims. (Motion at 10.) Still, Leeper maintains that Denali remains contractually "bound by the terms of the JLCA and may not reveal the content of [] Leeper's communications to it, even after it has terminated its participation [in the] JLCA." (Motion at 8.) Denali disagrees, arguing that the JLCA alone does not give rise to the "true common interest in a legal strategy" required for the privilege to attach. (Resp. at 22).

The JLCA's express terms are instructive on whether the agreement evidences a common legal interest sufficient to trigger the joint-defense privilege — not for their substantive, contractual effect but rather, as reasoned in *Stepney*, as a manifestation of the parties' legal collaboration and as a written invocation of the privilege as set forth in common law.

As parties to the JLCA, Leeper and Denali acknowledged they "share[d] a common interest in defending themselves" and that there existed a "mutuality of interest in many issues that may relate to the common defense of the Clients [elsewhere defined as Leeper and Denali] in the Matter." (JLCA ¶ 2.) The JLCA covers communications between Leeper and Denali, "including but not

limited to attorney work product, conversations, documents, interview memoranda . . . and the results of [] investigations (Joint Defense Communications')." (*Id.*) These communications

> w[ould] remain confidential and protected from disclosure to any Third Party by each Client's attorney-client privilege, each client's and attorney's work product doctrine immunity from discovery production, and the 'Joint Defense Doctrine' recognized in such cases as *United States v. Gonzalez,* 669 F.3d 974 (9th Cir. 2012), *United States v. McPartlin,* 595 F.2d 1321 (7th Cir. 1979), *Hunydee v. United States,* 355 F.2d 183 (9th Cir. 1965), and *Cont'l Oil Co. v. United States,* 330 F.2d 347 (9th Cir. 1964). As indicated in those cases, sharing of information for mutual benefit is not a waiver of applicable privileges or work product rules relating to discovery obligations. In other words, no sharing of information under this Agreement is a waiver of any otherwise applicable privilege or rule of production or discovery.

(*Id.*) Leeper and Denali agreed to share information "[t]o further the[ir] mutual interests . . . in promoting common defenses and sharing mutually beneficial legal strategies in the face of anticipated litigation . . . ." (*Id.* at ¶ 3.)

Even so, the parties "recognize[d that] before the Matter concludes, each attorney may need to, and is free to, take action which may be contrary to the interests of [the other.]" (*Id.* at ¶ 4.) Either party was free to terminate participation in the JLCA at any time, but was compelled to do so if it entered into a "cooperation arrangement or other agreement to assist . . . any enforcement agency . . . or private entity . . . adverse to the remaining Client . . . i.e., an arrangement [] to provide any information to the described agencies or private parties concerning matters within the scope of [the JLCA] in exchange for any . . . dispositional benefit . . . ." (*Id.* at ¶ 9.) However, a party terminating its participation from the JLCA would "remain[] bound to maintain the confidentiality of information received under th[e] Agreement." (*Id.*)

References to Leeper and Denali's mutual interests abound throughout the JLCA. Although the parties' characterization does not conclusively establish a common legal interest for purposes of

the joint-defense privilege, they do demonstrate their mutual intent to invoke such a privilege — and, under the precise language of the JLCA's second paragraph, expressly so. The parties explicitly incorporated and summarized the common law "Joint Defense Doctrine." This language demonstrates that Denali would sign the JLCA only if it truly believed its own interests were so aligned as to justify entering into such an agreement. Denali, to prevail on the instant Motion, must overcome this overt evidence of the formalization of the parties' common legal interest at the time. The JLCA is drafted in anticipation that the parties' interests may in fact diverge at some point in the future. Thus, the language of the JLCA strongly supports the inference that Leeper and Denali shared a legal interest at the time they entered into the JLCA.

### B. *Inducement*

Still, under *Gonzalez*, even proof of an express JDA does not end the joint-defense privilege inquiry. Also relevant is the context surrounding the agreement. Denali makes several equitable arguments, all in essence expressing that because Denali signed the JLCA in reliance on statements Denali now believes to be untrue — namely, Leeper's statements to Daher in late October and Kauffman's statements in late November 2016 — it should not be bound by the agreement.

Denali cites no specific case law to support this type of fraudulent inducement argument in the context of joint-defense privilege. JDAs are not typical contracts. *Stepney*, 246 F. Supp. 2d at 1079. And therefore, the typical defenses to contract enforceability do not apply in the same way. Moreover, Leeper's statements during the interview were in large part consistent with those Denali is alleging fraudulently induced them to enter into the JLCA. As such, Denali's argument that Leeper lied to get Denali to sign the JLCA only to change his story once protected by its confidences is not supported by the record.

Leeper counters that *United States v. Henke* guides that "allegedly untruthful statements made in a joint-defense context [are not] enough to void [JDA]s from their inception . . . ." (Motion at 11.) In *Henke*, co-defendants and their joint counsel held confidential pre-trial meetings under a JDA. 222 F.3d 633, 637 (9th Cir. 2000). Problems arose later when one of the defendants settled with and testified for the government, forcing the remaining defendants' attorneys to cross-examine him about information subject to the JDA. *Id.* Despite the obvious conflict, the district court allowed the case to proceed, and the Ninth Circuit reversed on conflict of interest grounds. *Id.*

Leeper likens his own situation, as Denali alleges it, to that of the *Henke* co-defendant, who "apparently changed his story and testified differently . . . from what he had communicated in joint-defense meetings" and notes the Ninth Circuit in *Henke* "did not suggest that the [JDA] itself was void as a result of the testifying defendants (sic) untruths." (Motion at 11.) That may be true, but that the *Henke* court made no mention of that point speaks only to its irrelevance to that holding. *Henke*'s discussion of the joint-defense privilege centered only on the attendant conflict of interests that might ensue after multiple co-defendants initially share counsel. Thus, the case does not help Leeper defend against Denali's fraudulent inducement argument.

But even so, given the dearth of precedent for applying fraudulent inducement in this context, coupled with the JLCA's specific references to the parties' mutual interests and express invocation of the joint-defense privilege, there exists strong evidence of collaboration between the parties on a common legal strategy. Therefore, from at least the signing of the JLCA, if not from when Denali allowed Leeper to return to work, Leeper and Denali's interests were sufficiently common to satisfy the first prong of the joint-defense privilege test.

*II.    In Furtherance*

Denali also contends that Leeper fails to meet the second prong: whether the purportedly privileged material was intended to further the parties' common legal interest. Denali cites *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437 (S.D.N.Y. 1995), and *United States v. Weissman*, 195 F.3d 96 (2d Cir. 1999), both denying joint-defense privilege — the former due to lack of "cooperation" between the parties and the latter because those parties' cooperation dealt only with responding to a criminal investigation.

In *Bank Brussels*, the court denied joint-defense privilege when the asserting party had merely "obtained an opinion letter from counsel concerning the viability of a potential transaction, and one of the issues addressed in that letter was possible litigation." *Id.* at 448. Because the parties' cooperation with respect to common litigation appeared in the letters as an ancillary discussion, the court reasoned they were not engaged in "pursuing a common legal strategy." *Id.* But *Bank Brussels* is inapposite here because Leeper's December 9 interview took place subject to an express JDA. And a review of Columbia's claims against both Leeper and Denali hardly make ancillary the interview's focus; rather the interview questions, and responses, were geared specifically toward and highly relevant to that impending litigation.

*Weissman,* however, is more apt. Weissman served as a financial officer for Empire when the company was investigated by a Senate subcommittee. *Id.* at 98. Empire hired counsel and Weissman assisted that counsel in presenting information to the government, though, as it would turn out, some of that information was false. *Id.* Evidence of Weissman's role in the wrongdoing later began to surface, and he hired his own counsel. *Id.* Weissman, his personal attorney, and Empire's counsel then worked together to assist in the Subcommittee's investigation. *Id.* Weissman's attorney informed him that although any disclosure of Weissman's improprieties to Empire could affect his

position internally with the company, it could not be disclosed to third parties because he and Empire were engaged in joint defense. *Id.* Weissman then made damaging admissions during two consecutive days of meetings with Empire and its counsel. *Id.* at 98–99. When Empire later learned it was also the target of a grand jury investigation, the company produced the contents of the two days' meetings. *Id.* at 99. Weissman objected, asserting joint-defense privilege, and the consequent evidentiary hearing before the district court centered on if and when an *implied* JDA had emerged. *Id.* The court concluded that communications from the second day's meetings were privileged due to specific discussions of joint defense, but held as admissible the first day's meeting statements because they occurred before the JDA arose. *Id.*

Affirming that decision, the Second Circuit rejected Weissman's argument that the "parties' cooperative efforts" preceding the meeting were alone sufficient to trigger the privilege. *Id.* It reasoned that "prior to Weissman's [] revelations [disclosed during the meetings], Empire had no reason to know of his wrongdoing." *Id.* Therefore, "preventing the disclosure of Weissman's wrongdoing was not an ongoing enterprise that Empire wanted to further." *Id.* Rather, the "course of conduct among Weissman and the attorneys prior to [the meetings] was one of cooperation." *Id.* at 100. Again, because Empire had "no reason to know of Weissman's unlawful conduct," that cooperation must have been only "to respond to the [subcommittee's] investigation, not to cover up Weissman's wrongdoing." *Id.*

Denali may be correct that, like Empire's in *Weissman*, Denali's legal strategy was to respond to the FBI's investigation, not to cover up Leeper's potential wrongdoing. But that is but one similarity among several distinctions between the two cases. First, the December 9 interview was subject to an express JDA, providing additional evidence at least some level cooperation. Second,

unlike Empire, though Daher testifies he questioned whether Leeper was in fact the hacker, Denali was formally noticed of Leeper's alleged wrongdoing well before the interview. Denali's position here might be different if it had learned of the allegations only through the interview itself. Instead, Denali learned from both Columbia and the FBI that Leeper may have hacked into Columbia's system, one month before it signed the JLCA and over two months before the interview. Thus, though the parties' cooperation may have in part been to respond to the FBI investigation, Denali was not blind to the potential that Leeper may indeed have committed the alleged acts.

Denali also offers *In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333, 341 (4th Cir. 2005), most factually analogous to the instant case, for its proposition that "an employee's cooperation in an internal investigation alone is not sufficient to establish a common interest." There, the employer interviewed its employee several times in conjunction with an internal company investigation. *In re Grand Jury Subpoena: Under Seal,* 415 F.3d at 335–36. Months later, the employee and company entered into a written "common interest agreement," after which the parties' respective attorneys shared information to facilitate their joint representation. *Id.* at 336. But when the SEC began to investigate the company on the same matter, the company disclosed details from the initial interviews. *Id.* at 337. The employee objected, asserting joint-defense privilege. *Id.* The district court found the privilege did not protect the interviews because they predated the common interest agreement. *Id.* The Fourth Circuit affirmed, noting that at the time of the interviews the company "was in the early stages of its internal investigation[,] there [wa]s no evidence showing that the investigating attorneys' interviews with [the employee] were for the purpose of formulating a joint defense." *Id.* at 341. In fact, "it would have been difficult for [the company] to know at that time whether its interests were consistent with or adverse to [the employee]'s personal interests."

*Id.* Additionally, though the opinion does not so state, it appears to have been uncontested that the communications made after the common interest agreement were privileged.

Thus, the Fourth Circuit in *In re Grand Jury Subpoena* did hold, under circumstances very similar to these, that internal company interviews made purely for the purpose of information gathering are not considered to be in furtherance of a common legal strategy. Unlike here, however, no JDA was in place at the time of those interviews. And, as in *Weissman*, the Fourth Circuit's conclusion was based at least in part on the company's lack of notice or suspicion at the time of the interview that the employee had engaged in wrongdoing, which is not the case here.

Although no case directly addressed facts such as those here, based on the substance of the Dec. 9 interview, it is clear the interview was intended to further the parties' common legal interests and joint defense. Though Denali may try to portray the inquiry as mere information-gathering like those in *Weissman* and *In re Grand Jury Subpoena*, Sprague's questions demonstrate that the information gleaned from the interview was clearly geared toward evaluating the viability of Columbia's claims and fashioning legal strategies as to *both* parties.

Because Leeper and Denali shared a common legal interest, evidenced most clearly in the JLCA, and because the post-JLCA interview was made in furtherance of that interest, the joint-defense privilege therefore applies.

### III.    Crime-Fraud Exception

Denali next argues that joint-defense privilege is barred here by the crime-fraud exception, that by withholding evidence of his MacBook Air and funneling untrue statements to Denali, Leeper "obstructed justice and tampered with witnesses." (Resp. at 28.)

The crime-fraud exception aims to ensure that the confidentiality enveloping a attorney-client

relationship does not encompass communications "made for the purpose of getting advice for the commission of a fraud or crime." *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (citing *United States v. Zolin*, 491 U.S. 554, 563(1989)). To invoke the crime-fraud exception, the party seeking discovery "has the burden of making a *prima facie* showing that the communications were in furtherance of an intended or present illegality . . . and that there is some relationship between the communications and the illegality." *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir.1988), *cert. denied*, 492 U.S. 906 (1989) (citations omitted); *see also In re Grand Jury Investigation*, 231 F. App'x 692, 695 (9th Cir. 2007) ("[T]he crime-fraud exception applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct.")). That is, "that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." *In re Grand Jury Proceedings*, 87 F.3d at 381 (citing *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)).

The joint-defense privilege, as an extension of attorney-client privilege, is likewise subject to the crime-fraud exception under the above analytical framework. *See United States v. Thomson*, 50 F.3d 18, *1 (9th Cir. 1995) (affirming district court's denial of joint-defense privilege on crime-fraud ground). Illustrative is *Youngevity Int'l, Inc. v. Smith,* in which a district court rejected application of the crime-fraud exception and instead held the contested communications protected under the joint-defense privilege. No. 16-CV-704 BTM, 2017 WL 4227025 (S.D. Cal. Sept. 22, 2017). A plaintiff company, Youngevity, sued a defendant competitor, Wakaya, founded by a former employee. *Id.* at *1. Wakaya sought disclosure of email communications between Youngevity and a former vendor of Wakaya's, Livewell, and the latter two parties objected to on joint-defense grounds. *Id.* at *1–*2. The court found the emails were indeed joint-defense privileged, based on

the subject matter of the emails themselves and that they were sent after Wakaya had filed suit and were prepared in anticipation of that litigation. *Id.* at *5. Nevertheless, Wakaya argued the crime-fraud exception foreclosed the privilege because the very sending of the emails in question was tortious, because they contained Wakaya's confidential information that Livewell was forbidden from disclosing to a competitor. *Id.* at *6. The court rejected this argument, noting that Wakaya had failed to prove that either Youngevity or Livewell "was 'engaged in or planning a criminal or fraudulent scheme,' the first requirement for showing the application of the crime-fraud exception to privilege protection." *Id.* (quoting *In re Grand Jury Proceedings*, 87 F.3d at 381).

Denali offers two potential crimes furthered by Leeper's communications: ongoing violations of both the Computer Fraud and Abuse Act ("CFAA") and the federal statute prohibiting witness tampering. With respect to the first, Denali contends Leeper continued to violate the CFAA by "withholding [] misappropriated computer data from Columbia" and delaying production of the MacBook Air. (*Id.;* citing generally 18 U.S.C. § 1030.) Leeper replies by maintaining that the computer he kept was not subject to the warrant because it was "not in the location subject to the warrant." (Reply at 19.)

Under federal law, witness tampering and obstruction include:

engag[ing] in misleading conduct toward another person, with intent to –

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to –

> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

> (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

> (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or . . .

> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge . . . of information relating to the commission or possible commission of a Federal offense . . . .

18 U.S.C. § 1512(b). According to Denali, "[Leeper] used his statements to Denali to funnel [false] information to the FBI . . . , " which, it argues, constitutes a violation of 18 U.S.C. § 1512(b)(1) – (3). (Resp. at 27, 28.)

Denali's general reference to the CFAA, without more, does not adequately establish that the brief retention of the MacBook Air effected any material delay on the government's investigation. Moreover, the government would have been made aware of this withholding at the time it received the additional computers, yet the record lacks any evidence that the government ever addressed or viewed this conduct as obstructionary.

However, under the broad language of the federal obstruction law, § 1512(b), it is plausible Leeper's interview statements did constitute engaging in misleading conduct toward Denali with an intent to influence its testimony; cause Denali to withhold evidence of the MacBook Air or other relevant information; or hinder or prevent Denali's accurate reporting to the FBI. In his eventual Plea Agreement, Leeper conceded certain factual allegations directly at odds with representations he made to Denali in the interview. In particular, he expressly admitted to intentionally remotely accessing Columbia's network for a period of over two years. (Plea Agreement ¶ 5; *see also* Petition to Enter Guilty Plea, Case No. 3:17-cr-00304-JO, ECF No. 8, at ¶¶ 3, 24.) By misrepresenting his innocence to Denali during the interview, Leeper may have influenced Denali's own testimony to

the government, albeit only collaterally.

Still, even if Denali could prove that Leeper obstructed Denali's testimony, based on the court's *in camera* review of the interview transcript, Leeper does not appear to have made the interview statements with the intent of doing so, let alone with the purpose of getting legal advice for the commission of those crimes, as required for the crime-fraud exception to apply. This is particularly true given that Leeper consented to the interview only after Denali agreed to enter into the JLCA, suggesting Leeper intended his statements therein to remain confidential and to not be relayed to the government through Denali's testimony. Thus, here there lacks a sufficient nexus between the communication and the illegality alleged, as required by *Laurins* and *In re Grand Jury Investigation*, 231 F. App'x 692. As was the case in *Youngevity, Int'l*, it does not appear Leeper was engaged in or planning a criminal or fraudulent scheme when he made the interview statements. Nor does it appear that Leeper made his interview statements seeking the advice of either Kauffman or Aliment to further that scheme, even if it did exist. As a result, the crime-fraud exception does not bar the joint-defense privilege's application in this case.

### IV. Waiver

Finally, Denali contends that Leeper somehow waived the joint-defense privilege via his statements to Daher in October 2016 and that Kauffman was complicit in that waiver through statements from the telephone conference on November 18, 2016. Denali relies on *Pac. Pictures*'s conclusions that (1) a party may not selectively waive attorney-client privilege (that is, that disclosure to the government constitutes complete waiver of privilege as to all third parties) and that (2) *post hac* confidentiality agreements cannot be used to shield earlier statements. According to Denali, both because Leeper's statements in October were consistent with those made after any

privilege attached and because Leeper made the statements thinking they would be relayed to the FBI, the later, privileged statements on the same subject were necessarily waived. Leeper concedes that the communications Leeper made to Daher in October 2016 are not covered by the JLCA, but he disagrees that these statements in any way waived the joint-defense privilege that arose afterward.

The rejection of selective waiver in *Pac. Pictures* derived from a different argument. The case involved disputed intellectual property rights and a defendant producer who had entered into a confidentiality agreement with the government, which was in the process of investigating the theft of the producer's confidential files. 679 F.3d at 1124–25. The agreement provided that any documents the producer disclosed to the government, many of which were relevant to the intellectual property conflict, would remain confidential as to third parties. *Id.* at 1125. When those documents were later sought by an entertainment company suing the producer, the Ninth Circuit "declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government," reasoning that to do so would be to "unmoor [the] privilege from its underlying justification." *Id.* at 1128. The court noted that the producer "provided no convincing reason that post hoc contracts regarding how information may be revealed encourage frank conversation at the time of the advice." *Id.*

To apply *Pac. Pictures* in the way Denali urges would misconstrue the court's reasoning and wrongly expand that holding. *Pac. Pictures* merely refused to create a new privilege; it did not so much as impact the traditional attorney-client, waiver, or joint-defense rules. Furthermore, factual distinctions caution against the application of *Pac. Pictures* here. Importantly, Leeper and Denali's connection to the FBI is far more attenuated than in *Pac. Pictures*, where the government was a party to the confidentiality agreement at issue. And again, Leeper, unlike the producer in *Pac. Pictures*,

had little reason to believe his interview statements would even be relayed to the government, given the existence of the JLCA. Lastly, a confidentiality agreement is not a JDA: the two serve different purposes and are analyzed under distinct frameworks. To apply *Pac. Pictures*'s "post hoc" language to a JDA therefore is unsound.

Finally, Denali references *United States v. Bergonzi* to argue Leeper waived the joint-defense privilege by attempting to use Denali to relay information to the FBI, thereby waiving the information to all third parties, much like the selective waiver issue discussed in *Pac. Pictures*. *United States v. Bergonzi* likewise posed a question unlike the one presently before this court: "whether [] attorney-client privilege attaches . . . where [a company] agrees, prior to [communications later alleged to be privileged], to disclose them to the Government" under a common interest agreement with the government. 216 F.R.D. 487, 493 (N.D. Cal. 2003). The case is therefore unhelpful here. Moreover, Denali misstates *Bergonzi*'s resulting conclusion. That court did not deem the privilege waived where a communication was made "knowing" it would be communicated to the government; rather, to be waived, the communication must have been made "with the *intent* to relay the communication to the Government," a much higher standard. *Id.* (emphasis added).

In sum, nothing in the case law suggests that statements made prior to a JDA effect a waiver of any joint-defense privilege that may be triggered subsequently. *Gonzalez*, 669 F.3d at 981. Nor does potential subsequent disclosure to the government have any bearing on the issue of joint-privilege here.

V.    *Work-Product Doctrine*

Denali also includes in its briefing what appears to be a preemptive response to any assertion

of work-product privilege Leeper might make. Leeper does not appear to be arguing for any such privilege. (Reply at 26) ("because the [November 22 and interview] communications are clearly covered by the attorney-client privilege, [] it is unnecessary to reach this argument.") Because the joint-defense privilege protects Leeper's interview statements, the court need not reach this question.

*Conclusion*

In sum, the court finds that Leeper and Denali held a common legal interest sufficient to trigger joint-defense privilege as to the interview and that the interview was made with the intent to further that common interest. Accordingly, Leeper's Motion (ECF No. 47) for Protective Order is GRANTED.

IT IS SO ORDERED.

DATED this 21st day of December, 2017.

JOHN V. ACOSTA
United States Magistrate Judge